Kathleen J. Abke, #12422
Savanna Jones, #17624
STRONG & HANNI
102 South 200 East, Suite 800
Salt Lake City, Utah 84111
Telephone: (801) 532-7080
Facsimile: (801) 596-1508
kabke@strongandhanni.com
sjones@strongandhanni.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ADAM M., individually and on behalf of his minor child, I.M., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY; UNITED BEHAVIORAL HEALTH; and OPTUM BEHAVIORAL HEALTH, <br><br> Defendants. | **COMPLAINT** <br><br><br> Case No. 2:22-cv-00429-DAO <br><br> Judge Daphne A. Oberg |

Plaintiffs Adam M. ("Adam") and I.M. ("I."), by and through undersigned counsel, complain and allege against Defendants UnitedHealthcare Insurance Company ("United"); United Behavioral Health ("UBH") and Optum Behavioral Health ("Optum"), as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Adam M. and I. are individuals residing in Broomfield County, Colorado. Adam is I.'s father.

2. At all relevant times, Adam and I. were covered by United Healthcare, administered by United Behavioral Health and/or Optum Behavioral Health (the "Plan"), provided through Adam's employer, Insperity Holdings.

3. As a beneficiary of her father's health insurance plan, I. received treatment, which United is responsible to cover, at Open Sky Wilderness Therapy ("Open Sky") in Durango, Colorado from June 1, 2020 through August 26, 2020 and at Cascade Academy ("Cascade") in Midway, Utah from September 11, 2020 through June 24, 2021, which United is responsible to cover.

4. Open Sky is a Colorado-licensed residential facility that provides sub-acute inpatient treatment to adolescents with mental health, behavioral and/or substance abuse problems.

5. Cascade is a Utah-licensed residential treatment facility that provides subacute inpatient and intermediate behavioral health treatment to adolescent girls with mental health and behavioral disorders.

6. The Plan is an employee benefit plan under 29 U.S.C. § 1001 et seq., the Employee Retirement Income Security Act of 1975 ("ERISA").

7. At all relevant times, UBH and Optum acted as agents for the Plan and United.

8. UBH and/or Optum denied claims for payment of I.'s medical expenses in connection with her treatment at Open Sky and Cascades.

9. This Court has jurisdiction over this case under 29 U.S.C § 1132 (e)(1) and 28 U.S.C. § 1331.

10. Venue is appropriate under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(c) based on ERISA's nationwide serve of process and venue provisions, and because United, UBH and Optum do business in Utah, many individual participants and beneficiaries of United-insured and administered ERISA benefit plans reside in Utah, and part of the treatment at issue took place in Utah. In addition, venue in Utah will save the Plaintiff costs in litigating this case. In light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely I.'s privacy will be preserved.

11. Plaintiffs seek payment of I.'s denied claims from June 1, 2020 through August 26, 2020 (the "Open Sky Denied DOS") and from November 23, 2020 through December 14, 2020 (the "Cascade Denied DOS") pursuant to the terms of ERISA the Plan, and pursuant to 29 U.S.C § 1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. § 1132(a)(3) based on the Defendants' violation of the Mental health Parity and Addiction Equity Act of 2008 ("MHPAEA").

12. Plaintiffs also seek an aware of prejudgment interest and attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## GENERAL ALLEGATIONS

### *Background*

13. I. is the oldest of three children. From an early age, I. demonstrated restricted interests and difficulties with emotional regulation.

14. When she entered school, I. excelled academically, but struggled particularly in her social interactions with peers and with her younger siblings at home. I. was isolated from classmates, made few friends and was the target of bullying.

15. I.'s frustrations in school led to explosive outbursts of anger at home, often directed at her younger siblings. I. would regularly threaten to kill herself or siblings, often describing what she would do in graphic detail. I. would scream and shout at her parents and refused to be contained. Over time, I.'s siblings became terrified of her and were beginning to show signs of anxiety and other problems resulting from I.'s behavior.

16. I.'s parents attempted to help her by taking her to traditional therapy and trying various medications. These modalities proved ineffective, particularly in the home environment. I.'s only coping mechanism was keeping busy with her academic work and academic-based extracurricular activities.

17. When the COVID-19 pandemic hit and schools and activities were closed down, I.'s former coping mechanisms were no longer available. It quickly became apparent that I. could not safely stay in the same home with her younger siblings. I. was sent to live with family out of state, but her anger outbursts and defiance soon became too much for I.'s family members to handle and I. had to return home.

18. Upon her return, I.'s parents realized that I. needed a higher level of care in a controlled setting where I. could be safe and receive appropriate educational and emotional care. Given the pandemic, there were very few "traditional" treatment facilities available to meet I.'s mental health needs. I.'s parents subsequently enrolled her in Open Sky.

*Treatment at Open Sky*

19. I. was admitted to Open Sky on June 1, 2020 for treatment of her mental, emotional and behavioral issues.

20. Upon her admission, I. was evaluated by a Ph.D.-level mental health counselor who developed an individualized treatment plan for I.'s mental health diagnoses, which included

Disruptive Mood Dysregulation disorder, Generalized Anxiety Disorder, Depressive Disorder, Impulse Control Disorder and Parent-Child Relational Problem.

21. During her time at Open Sky, I. participated in individual therapy, family therapy, skill-building, mindfulness practices and self-care and emotional resiliency skill development. She also received psychiatric treatment from a licensed psychiatrist who managed I.'s medications.

22. Within three weeks of her admission, I. underwent a full psychological evaluation performed by a Colorado and Utah-licensed psychologist, which included an interview and completion of over 15 standard psychological test measures. The psychologist diagnosed I. with Austism Spectrum Disorder and ADHD in addition to her previous diagnoses.

23. I. made slow but steady process while at Open Sky.

24. I. was discharged from Open Sky on August 26, 2020. Upon her discharge, I.'s treatment team recommended that she transition to a residential treatment center to support I.'s continued progress.

*Treatment at Cascade*

25. I. was admitted to Cascade on September 11, 2020 for continuing treatment of her mental health diagnoses.

26. During her time at Cascade, I. participated in individual, group and family therapy sessions with certified mental health counselors. She was also under the care of an APRN for medication management.

27. I. participated in a home visit during the week of Thanksgiving, 2020. She continued to participate in individual and family therapy sessions with Cascade staff via Zoom during this time. The home visit reportedly went well, but I. was still struggling with handling frustrating or overstimulating circumstances at home.

28. Upon her return to Cascade, I. stated that she felt "relieved" coming back because she felt she could better work through her behavioral issues and "the stakes were not high" at Cascade as they were at home.

29. In a therapy session on December 2, 2020, I. reported that she was still struggling with peer-to-peer interactions, such as making friends and recognizing social cues. I. further reported that she had a lot to work on with respect to conflict resolution skills.

30. On December 3, 2020, I.'s treatment plan was reviewed. Her counselor noted that I. "appears disorganized but easily dysregulated, often getting visibly upset when making mistakes, receiving feedback or when she feels excluded." I. was still struggling to handle frustration appropriately and was continuing to threaten and verbally assault her peers.

31. On or about December 14, 2020, I. had to leave Cascade and continue her treatment remotely due to the COVID-19 pandemic.

*Prelitigation Claims Denials and Appeals*

32. Claims were submitted to the Plan for coverage of I.'s treatment at Open Sky.

33. United denied payment of I.'s treatment at Open Sky based on missing information and stated that it requested additional medical records from the provider.

34. On February 1, 2021, United again denied payment for I.'s treatment at Open Sky. This time, the reason given for the denial was because Open Sky "provide[s] wilderness therapy," and the Plan excludes coverage for "Alternative Treatments" which include "Adventure-based therapy, wilderness therapy, outdoor therapy, or similar programs

35. In its denial letter, United admitted that they received the previously-requested medical records from Open Sky on October 26, 2020.

36. The denial letter further stated that Plaintiffs were entitled to pursue United's internal appeals process through UBH/Optum.

37. Accordingly, on June 4, 2021, Plaintiffs timely submitted a level 1 appeal of Defendants' February 1, 2021 denial of payment for I.'s treatment at Open Sky for the Open Sky Denied DOS, as instructed in United's February 1, 2020 letter.

38. In Adam's June 4, 2021 level 1 appeal, he reminded UBH/Optum that he was entitled to certain legal protections during the appeals process pursuant to ERISA. Specifically, ERISA required all reviewers assigned to Adam's case be appropriately qualified to review the same.

39. Based on the unique circumstances of I.'s mental health diagnoses and treatment needs, Adam further requested that I.'s care be reviewed by a medical or vocational expert who is knowledgeable about generally accepted standards and clinical best practices for outdoor behavioral health programs.

40. Adam provided a detailed explanation and evidence that Defendants' conclusion, which he alleged was based on its application of Optum's criteria entitled "Behavioral Clinical Policy: Wilderness Therapy", that I.'s treatment at Open Sky was "experimental" or "unproven" was false and based on outdated and disproven criteria.

41. Adam first pointed out that the Plan contains a definition of experimental services that I.'s treatment at Open Sky did not meet.

42. Adam also provided peer reviewed literature showing that Outdoor Behavioral Healthcare ("OBH") like that I. received at Open Sky is not synonymous with other types of "wilderness bootcamps" that employ confrontation, deprivation and punishment tactics. Instead, OBH is aligned with professional guidelines, practices, and standards of various professional

associations. The literature also showed that OBH has been shown in some cases to be more effective that traditional treatment facilities and adolescents participating in OBH programs reported a significant decrease in symptoms.

43. Adam also noted that Open Sky met the Plan's definition of an "Alternate Facility" because it is a Mental Health Care Center or Residential Treatment Center for Children and Adolescents that is not a Hospital and provided Mental Health Care Services or Substance Related and Addictive Disorders Services on an outpatient or inpatient basis.

44. Adam further argued that application of Optum's Behavioral Clinical Policy: Wilderness Therapy" was improper in any event because it is external to the Plan and not a Plan requirement.

45. Adam reminded UBH/Optum of his rights under both ERISA and the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"). Specifically, he advised UBH/Optum that plans such as the Plan that offer behavioral health benefits are required to offer those benefits at parity with comparable medical or surgical benefits and that MHPAEA requires coverage for intermediate facilities such as Open Sky.

46. On July 9, 2021, UBH denied payment for I.'s treatment at Open Sky. A Coding Quality Analyst, Christina D. Phelps, set forth the following reasons for denying payment for care:

> The billed service is considered a non-covered service per the Behavioral Clinical Policy: Wilderness Therapy, as this therapy is considered unproven for the treatment of diagnosis Attention-Deficit Hyperactivity Disorder.

47. The July 9 denial letter further stated that I. could request an external review of the decision by an Independent Review Organization (IRO) within four months from the date of the letter.

48. On September 15, 2020, UBH denied coverage for I.'s treatment at Cascade because UBH determined that I. had "no medical issues," was active in her treatment, had a supportive family, was not a danger to herself or others and her symptoms were stable. UBH concluded that I.'s care and recovery could be provided in an intensive outpatient setting.

49. On January 28, 2021, Plaintiffs timely submitted a level 1 appeal of UBH's denials of payment for I.'s treatment at Cascade from her admission through December 14, 2020.

50. In his appeal letter, Adam argued and provided overwhelming evidence that I.'s treatment at Cascade was medically necessary, including Letters of Medical Necessity from I.'s psychologist, psychiatrist, and counselors, as well as over 500 pages of medical records.

51. On March 5 and March 6, 2021, UBH issued letters approving, in part, and denying, in part, payment for I.'s treatment at Cascade. Payment for I.'s treatment from September 11, 2020 through November 22, 2020 was approved. Treatment after November 23, 2020 was denied. Reviewer Nelson P. Gruber, M.D. stated that the latter dates of service were denied because I. "no longer met the guideline for further coverage in the residential treatment setting" because, essentially, she made progress in treatment.

52. The March 5, 2021 denial letter further stated that I. could request an external review of the decision by an Independent Review Organization (IRO) within four months from the date of the letter.

53. On June 25, 2021, Plaintiffs timely submitted a request IRO review of UBH's March 6, 2020 denial of Payment for I.'s treatment at Open Sky for the Cascade Denied DOS.

54. On September 9, 2021, Adam received a letter from MCMC, an IRO, upholding the denial of I's.'s treatment for the Cascade Denied DOS as not medically necessary.

55. Plaintiffs exhausted their prelitigation appeal obligations under the terms of the Plan and ERISA.

56. The denial of benefits for I.'s treatment was a breach of contract and caused Adam to incur medical expenses that should have been paid by the Plan in an amount totaling over $70,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. § 1132(a)(1)(B))

57. Defendants incorporate by reference paragraphs 1 through 57, above.

58. ERISA sets higher-than marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as an agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. § 1104(a)(1).

59. ERISA also emphasizes accurate claims processing and evaluation by requiring administrators to provide a "full and fair review' of claim denials and to engage in a meaningful dialogue with Plaintiffs in the pre-ligation appeals process. 29 U.S.C. § 1133(2).

60. Defendants breached their fiduciary duties to Plaintiffs when they failed to comply with their obligations under 29 U.S.C. §§ 1104 and 1133 to act solely in I.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of E's claims.

61. Specifically, Defendants breached their fiduciary duties by:

   a. Failing provide coverage for I.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

   b. Applying incorrect and outdated criteria to deny coverage for OBH treatment;

    c. Applying exclusion criteria that did not exist in the Plan to deny I.'s claims;

    d. Failing to appropriately review I.'s denied claims, including failing to meet the requirement that medical reviewers have opinions and expertise equivalent to the claimant's treating providers; and

    e. Failing to conduct a meaningful analysis of Plaintiffs' appeals or whether Defendants provided Plaintiffs with the "full and fair review" to which they are entitled. Defendants failed to substantively respond to the issues presented in Adam's appeals and did not in any way address the arguments and concerns raised during the prelitigation appeals process.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. § 1132(a)(3))**

62. Defendants incorporate by reference paragraphs 1 through 62, above.

63. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MPAEA is part of United's fiduciary duties.

64. MHPAEA requires ERISA plans to provide coverage for mental health treatment and substance use disorders that is no less generous or favorable than that provided for treatment of medical/surgical disorders and conditions.

65. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by ERISA plans and from imposing separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C. § 1185(a)(3)(A)(ii).

66. Examples of improper nonquantitative treatment limitations under MHPAEA include, but are not limited to: medical management standards limiting or excluding benefits based on medical necessity; restrictions based on geographic location; facility type, provider specialty; and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. § 2590.712(c)(4)(ii)(A) and (H).

67. The Plan offers comparable benefits for medical/surgical treatment that the Plan excluded for I.'s treatment, including sub-acute inpatient treatment settings including skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. Defendants do not exclude or restrict coverage of these analogous medical/surgical conditions by imposing restrictions such as those applied to I.'s claims in the manner they excluded coverage of I.'s treatment at Open Sky and Cascade. Doing so would violate both the terms of the insurance contract and generally accepted standards of medical practice.

68. The Plan violated MHPAEA by denying coverage for life-saving mental health benefits based solely on the type of facility where I. sought mental health treatment, by deeming it "experimental" in contradiction of the Plan's definition of the same and generally known and accepted data in the mental health field.

69. The Plan also violated MHPAEA by evaluating I.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when analogous levels of medical or surgical benefits would have been paid.

70. The actions of Defendants in failing to provide coverage for I.'s treatment violates the terms of the Plan, ERISA and its underlying regulations, and MHPAEA.

71. The actions of Defendants have caused damage to Plaintiffs in the form of denial of payment of I.'s treatment.

72. Plaintiffs have the right to obtain appropriate equitable remedies under 29 U.S.C. § 1132(a)(3) based on United's and the Plan's violations of MHPAEA including, but not limited to:

a) A declaration that Defendants' actions violate MHPAEA;

b) An injunction ordering Defendants to cease violating MHPAEA and requiring compliance with the statute;

c) An order requiring the reformation of the Plan's terms and the medical necessity criteria utilized by Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

d) An order requiring disgorgement of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and United insured plans as a result of Defendants' violations of MHPAEA;

e) An order requiring an accounting by Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of Defendants' MHPAEA violations;

f) An order based on the equitable remedy of surcharge requiring Defendants to provide payment to Plaintiffs as make-whole relief for their loss;

g) An order equitably estopping Defendants from denying Plaintiffs' claims in violation of MHPAEA; and

h) An order providing restitution from Defendants to Plaintiffs for their losses arising out of Defendants' violations of MHPAEA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants in an amount to be proven at trial, as follows:

1. Judgment in the total amount that is owed for I.'s mental health treatment for both the Open Sky Denied DOS and Cascade Denied DOS.

2. Appropriate equitable relief under 29 U.S.C. § 1132(a)(3) as outlined in Plaintiffs' Second Cause of Action.

3. Pre- and post-judgment interest on the past due benefits pursuant to Utah Code Ann. § 15-1-1.

4. Attorney fees and costs incurred pursuant to 29 U.S.C. § 1132(g); and

5. For such further relief as the Court deems just and proper.

DATED this 28th day of June 2022.

STRONG & HANNI

By: */s/ Kathleen J. Abke*
Kathleen J. Abke
Savanna Jones
*Attorneys for Plaintiffs*

County of Plaintiffs' Residence:
Broomfield County, Colorado